[No. 21845.   Department Two.   July 1, 1929.]

MILDRED STILES, *by her Guardian ad litem, E. H. Stiles,*
*Appellant,* v. PANTAGES THEATRE COMPANY
*et al., Respondents.*[1]

*P. L. Pendleton* and *W. G. Palmer,* for appellant.

*Ryan, Desmond & Ryan,* and *George R. Stuntz,* for
respondents.

PARKER, J.—The plaintiff, Mildred Stiles, a seven-
teen-year-old girl aspiring to become a moving-picture
actress, by her guardian *ad litem,* seeks recovery of
damages from the defendants theatre company and its
manager, claimed as resulting to her from their unwar-
ranted exclusion of her from participating in the finals
of an amateur moving-picture acting contest conducted

[1]Reported in 279 Pac. 112.

by them, accompanied by a promise of an award to the successful contestant, consisting of a trip from Tacoma to Hollywood, California, and return, with all expenses paid. A trial upon the merits in the superior court for Pierce county, sitting with a jury, resulted in a verdict awarding to plaintiff recovery in the sum of $1,000. Counsel for the defendants timely moved the court for judgment in their favor notwithstanding the verdict; this upon the ground that the evidence entitled them to such judgment as a matter of law. The court granted this motion, and entered judgment of dismissal accordingly, from which the plaintiff has appealed to this court.

At the times in question, the respondent theatre company owned and operated a vaudeville and moving-picture theatre in Tacoma known as the Pantages. The respondent Kendrick was then its general manager. On Monday, February 21, respondents caused to be published in daily newspapers in Tacoma advertisements of its entertainments, reading, in so far as need be here noticed, as follows:

"PANTAGES

"Four Days—Today, Tues., Wed., Thurs.
"Paramount JUNIOR STAR MOVIE Contest for Tacoma Boys and Girls 3 screen tests daily on Pantages stage —Winner Selected by Audience Will Receive
"FREE! All expense Round Trip to HOLLYWOOD."

Advertisements of the same import appeared in the daily newspapers of Tacoma a day or two prior to February 21. Preliminary contests or "tryouts" were held during the entertainments given on Monday, Tuesday and Wednesday; that is, on February 21, 22 and 23. On Thursday, February 24, respondents caused to be published in the daily newspapers in Tacoma advertisements for its entertainments for that

day, reading, in so far as need be here noticed, as follows:

"Pantages
"Finals Tonight!
"Help Select the Winner of
"Free Trip to Hollywood
"In Paramount Junior Star Movie Contest. Last tryouts today, 1 p. m., for little tots; 1 p. m. for juniors—then all the winners of tryouts brought together at 9 p. m. for final judging by audience and awarding of prize. See Tacoma's loveliest girls—most handsome youths."

These are the only advertisements of the contest shown upon the trial. No other printed or written announcements of the contest or of its nature, or of rules or conditions governing the contest were shown upon the trial. However, it seems to have been understood between respondents and those desiring to enter the contest that it would consist of the appearance of each contestant upon the stage before the audience and performing some act, the audience then choosing the winner, such choice to be evidenced by the amount of applause given him or her by the audience.

Let appellant tell her own story as to how she was induced to enter the preliminary contest on Monday, February 21, her becoming the winner in that preliminary contest and her exclusion by respondents from entering the final contest on Thursday, February 24. We quote from her counsel's abstract of her testimony:

"My name is Mildred Stiles; I was attending Lincoln High School, and have lived in Tacoma, Washington, nine years; on February 21, I was acquainted with Harry M. Kendrick, who was the manager of the Pantages Theatre at that time at Tacoma; I had known him about a year; I saw the advertisements. I saw the ad a day or two before the contest was held. Relative to the advertisements, I had a conversation with Mr.

Kendrick the first day the contest was held, February 21; about 1:00 p. m. he asked me if I had read in the papers about the contest that they were holding, and said he would like to have me enter as he thought that was a contest I would be able to win and he would like to see me win it.

"I was at home when I had the telephone conversation; I believe he was in his office; I told him I had read the announcement in the paper and was considering it, I was thinking about it; he told me to think it over so I told him I would; a couple of hours later he called me again and asked me if I had decided to enter the contest; I told him I would come down and talk it over with him; I went to his office in the Pantages building and he asked me if I would enter the contest, and I told him I would if he thought I had a chance of winning. He said, 'Well, this would be a good contest for you to win.' He said, 'This would be a nice trip for you and it might get you further along in the work that you like.' As a result of that conversation I decided to enter it.

"I entered the contest about 4:00 that afternoon with an audience present, and the audience selected myself as the winner; there were five or six others who went back stage for this tryout, and we all put our make-up on and stood back stage or on the stage, rather, and watched a picture of Bebe Daniels and then one at a time we imitated what we saw on the screen, and they were going to select three that afternoon, and after we had all finished doing our part we lined up and from the applause of the audience I was the only one selected; they did not select three, just myself.

"After being chosen on February 21, 1927, I did not appear any more until the finals on the 24th. One of the employees of the theatre on the 24th called me on the telephone and put me in conversation with Mr. Kendrick, who told me I was not to appear at the finals; I went down to his office, after I received these telephone calls, to see what it was all about; I asked him why he was not going to let me appear in the finals, and he said for reasons of his own; and he looked down at his desk and kept on writing and didn't pay any

attention to me; I said, 'Mr. Kendrick, won't you give me a reason why I cannot?' I said, 'I am enthusiastic over it and planning on it. I would like a reason.' He jammed his fist on his desk and said for me to get out, that he was busy and he didn't have to give me or anybody else any reasons. So I walked out. That was about 1:30 p. m.

"I went to the theatre and entered the back stage that evening to take a part in the final contest; I went into the dressing room with the rest of the boys and girls, they were putting on their make-up, and started putting on my make-up. I was putting on my make-up, and had just about finished, and Mr. Kendrick came back stage and said, 'How did you get in here, I thought I told you not to come into this theatre.' I said, 'I am going to try to go on, I feel that I have a right to take part in this, and I have certainly planned on it enough, and you won't give me a reason why I cannot.' I said, 'If you will just give me a reason why, that will be sufficient.' And he stormed at me and shook his fist in my face and he also swore at me, and told me to get out of the theatre or he would put me out. The time had not come yet to go upon the stage, and the actors all went on up stairs, and I started to walk up the stairs and Mr. Kendrick stood in front of me and prevented me from going up stairs. When Mr. Kendrick said he knew I would win, he said, a number of people knew I had worked there and they would think it was a put up job and his reputation would be ruined.

"My health was all right before the contest; it was perfectly all right; I had never been ill, afterwards I was sick; I was nervous and run down; I went to medical practitioners; because of this contest I was so disappointed and broken-hearted over it I was ill; I did not go to school the rest of the term because I did not feel well and was under the doctor's care; I could not sleep; I lost seven or eight pounds; I was so disappointed and sick over it because I had not been allowed to enter; I had planned on it so much; this was the opportunity I had been waiting for; I was nervous and touchy; I cried because of my disappointment; I

cried because of the lack of opportunity that was lost to get some place in the work I like; I thought about it and cried over it for two or three weeks; I have not forgotten it now. I was under the doctor's care for about nine weeks.

"I have worried about my experiences, but have improved in health some; I was so disappointed because I had so planned on it, and from seeing the other contestants and judging their ability, I felt that I had a good chance to win; under the terms of the advertisement had I won I would have been given a round trip to Hollywood; I was disappointed in not getting the trip, and a chance for a larger career; I could not have gone to Hollywood any other way, except on this trip; I have never been there. Because of loss of the opportunity, I became sick; I went into this contest through Mr. Kendrick talking to me, and wanting me. I had worked there at the theatre from time to time. I had not worked there that week."

While there is in appellant's testimony much more of detail, the above quoted portions of her testimony contain the substance of all that comes near lending support to her claimed right of recovery in this case, which recovery is manifestly sought for mental suffering resulting from her being excluded from the final contest. She does not seek recovery of any direct pecuniary loss for breach of contract. This is not a case of claimed damage for failure to give an earned offered award, as it would be if appellant had been permitted to enter the final contest and then earned the offered award. But, plainly, this is a case prosecuted only upon the theory that appellant has suffered mental distress which in turn impaired her physical health.

It seems clear to us, in the light of our prior holdings, that mere mental suffering resulting from the act of another which is not wilful, in the sense of being malicious, such act being unaccompanied by physical

632

injury caused at the same time, is not ground for recovery of damages. The law upon this subject has been reviewed in a number of our decisions and announced in substance as thus stated. See, *Corcoran v. Postal Telegraph-Cable Co.*, 80 Wash. 570, 142 Pac. 29, L. R. A. 1915B 522; *Kneass v. Cremation Society*, 103 Wash. 521, 175 Pac. 172, 10 A. L. R. 442; *Barnes v. Bickle*, 111 Wash. 133, 189 Pac. 998; *Gadbury v. Bleitz*, 133 Wash. 134, 233 Pac. 299.

We do not see in this record any substantial evidence of wilful or malicious action on the part of the theatre company's manager in his preventing appellant from participating in the final contest. True, it might be said that his conduct towards her when she sought to go upon the stage and he then prevented her from doing so, was in some measure rude, but we must remember that, several hours prior to that time, she had received his final decision that she could not enter the final contest that evening. Yet, she wilfully, without his knowledge, gained access to the theatre dressing room with the intent of ignoring his decision that she should not participate in the final contest that evening.

We agree with the trial court that there is no room in this case for reasonable minds to conclude that the manager of the theatre wilfully, in the sense of maliciously, excluded appellant from participating in the final contest, and that hence there is no foundation for her recovery of damages for the mental suffering she claims to have undergone by reason of being so excluded; remembering that, in the manager's exclusion of appellant from the final contest, he inflicted no physical injury upon her whatever, and that she does not seek pecuniary damages because of violation of any of her contract rights.

We conclude that the judgment of dismissal in favor

of the theatre company and its manager, notwithstanding the verdict of the jury in favor of the appellant, was a correct disposition of the case. That judgment is affirmed.

MILLARD, MAIN, TOLMAN, and FRENCH, JJ., concur.